**The SLAVENBURG CORPORATION,**
Plaintiff,

v.

**HOWARD SOBER, INCORPORATED,**
Defendant.

United States District Court
S. D. New York.

Feb. 13, 1963.

Garfield, Salomon & Mainzer, New York City, Edward Garfield, New York City, of counsel, for plaintiff.

Richard M. Glassner, Newark, N. J., for defendant.

McLEAN, District Judge.

This is an action for damages for the alleged conversion of 42 Volkswagen automobiles. Plaintiff, a New York corporation, is engaged in the business of commercial factoring. It financed the purchase of the automobiles. Defendant, a Michigan corporation, is engaged in the business of interstate transportation of automobiles. As an incident of this business, it warehouses automobiles prior to their transportation. It stored the automobiles in question in Baltimore, Maryland.

Defendant called no witnesses and rested on its motion to dismiss made at the close of plaintiff's case. There is no real dispute as to the facts, most of which are stipulated. I find them to be as follows:

On or prior to July 8, 1960, Impala Trading Corp. ("Impala"), contracted to purchase 400 used Volkswagen automobiles from a seller in Germany, to be shipped to Baltimore. On July 8, 1960 Impala entered into an agreement with All Commerce and Trading Corp. ("All Commerce"), a New York corporation, whereby Impala transferred all its rights in these Volkswagens to All Commerce. All Commerce agreed to establish letters of credit in favor of the German seller to cover the purchase price of the automobiles. All Commerce obtained these letters of credit from plaintiff, with whom it had done business since November 1959.

On July 12, 1960 All Commerce delivered to plaintiff two applications for letters of credit, each in the amount of DM 730,000, each covering the invoice value of 200 Volkswagens. Pursuant to these applications, plaintiff established letters of credit in favor of the German seller.

It was the usual course of dealing between plaintiff and All Commerce to consider each letter of credit a separate

340

"transaction." Plaintiff assigned the "transaction number" 1170 to the first letter of credit and 1173 to the second. Pursuant to similar applications by All Commerce, also dated July 12, 1960, plaintiff also established letters of credit covering the shipping and other expenses of the respective transactions.

The only significance of the "transaction numbers" in this action would appear to be this: When All Commerce first began to do business with plaintiff on November 9, 1959, All Commerce executed a loan agreement which gave plaintiff a general lien upon all property of All Commerce in plaintiff's possession as security for all obligations owed by All Commerce to plaintiff. On July 11, 1960 plaintiff and All Commerce executed a document which, although ambiguously worded, is susceptible of the construction that henceforth the debt of All Commerce to plaintiff on a particular transaction was to be secured only by the property of All Commerce in plaintiff's possession arising out of that transaction. Under the facts of this case, however, as will subsequently appear, this limitation on the broad coverage of the 1959 loan agreement does not affect the result.

Each of the applications for the letters of credit filed by All Commerce with plaintiff on July 12, 1960 provide that All Commerce recognized plaintiff's "ownership in and unqualified right to the possession and disposal of all property" shipped pursuant to the credit, "whether or not released to us on trust or bailee receipt * * * until such time as all of our [All Commerce's] obligations and liabilities to you * * * have been fully paid and discharged * * *."

The applications also contained provisions giving plaintiff a lien on all property of All Commerce in its possession or under its control "whether or not such property is in whole or in part released to us on trust or bailee receipt" as security for all obligations of All Commerce to plaintiff.

Plaintiff discharged its obligations under the letters of credit by paying the purchase price of the Volkswagens and the charges for freight, duty, etc. Plaintiff thereupon received the ocean bills of lading, the commercial invoices of the German seller and German certificates of origin, referred to by the parties as "title books." Plaintiff proceeded to release these documents to All Commerce under trust receipts executed by All Commerce, two of which were dated August 2, 1960 and the third August 16, 1960. The first trust receipt covered the documents relating to 81 of the Volkswagens, the second the documents relating to another shipment of 127 automobiles, and the third the documents relating to a shipment of 110 automobiles, a total of 318 automobiles, among which were the 42 cars involved in this case. These trust receipts are the foundation of defendant's defense in this action. They will be discussed in detail hereinafter. For present purposes it is sufficient to say that they provided that the documents were released to All Commerce for the purpose: "to allow Trustee [All Commerce] to secure New Jersey titles, offer for sale and from the proceeds of the sales repay Entrustor [plaintiff] for advances made."

Shortly before August 11, 1960, the first shipment of Volkswagens arrived in Baltimore. Plaintiff retained a Baltimore freight forwarder, John S. Connor, Inc. ("Connor"), to store them with defendant, which he did on August 11. The two subsequent shipments which arrived within the next few days were also stored by Connor with defendant. With respect to each shipment, defendant agreed with Connor that defendant would not release any of the automobiles without prior authorization from Connor. Connor was acting throughout as plaintiff's agent, although defendant was not aware of that fact at the time.

The course of dealing between plaintiff and All Commerce with respect to these automobiles was described at length by plaintiff's witness, and was not controverted by defendant. It was substantially as follows:

All Commerce applied to the New Jersey Department of Motor Vehicles for

New Jersey "title certificates" for the automobiles. The certificates were issued to All Commerce on the strength of the German "title books" and invoices which plaintiff had released to All Commerce under the trust receipts. All Commerce would then contract to sell certain of the automobiles to its customers, who were retail auto dealers located in various parts of the country. Having contracted to sell a certain number of cars, All Commerce would come to plaintiff and request the release of that number of cars from storage. Before granting a release, plaintiff would demand that All Commerce pay to plaintiff a certain specified amount per car in reduction of All Commerce's indebtedness to plaintiff. This amount varied from time to time. It depended upon plaintiff's judgment as to what would be sufficient to protect plaintiff, taking into account the amount of All Commerce's indebtedness and the current state of the account. The amount so required did not purport to be, and in fact was not, the wholesale market value of the car in Baltimore. The amount which plaintiff fixed in August 1960 was $1,200 per car.

All Commerce would pay the specified amount per car to plaintiff, who would credit the payment to All Commerce's account, and would then instruct Connor to release the specified number of automobiles. Connor in turn would instruct defendant. Defendant would thereupon release the cars from storage and would proceed to transport them for the account of All Commerce to All Commerce's customers.

This course of dealing was consistently followed by the parties for months. It was not until March 31, 1961 that plaintiff discovered that on various dates from August 16, 1960 to October 21, 1960 inclusive, defendant had, at All Commerce's request, released 42 cars from storage without receiving authorization from Connor to do so. All but three of these were released between August 16 and August 20, 1960. It is undisputed that this came about because of the fact that the employee of defendant who normally handled these transactions was on vacation at the time. The president of All Commerce prevailed upon the employee of defendant who was temporarily in charge to release the cars without first obtaining the necessary authorization. How All Commerce managed to obtain the release of the three additional cars in September and October 1960 does not appear. In each case once the cars were released, defendant transported them to the dealers who had purchased them from All Commerce. Defendant acted for All Commerce in so doing and All Commerce paid the cost of transportation.

Shortly after plaintiff learned of this on March 31, 1961, it made demand on defendant for delivery of the 42 cars. The demand was refused. All Commerce has never made any payment to plaintiff with respect to these cars.

Plaintiff sued All Commerce for conversion in the Superior Court of New Jersey. Defendant was not a party to that action, but its employees testified at the trial as witnesses for plaintiff. On October 4, 1962, the Superior Court awarded judgment to plaintiff for $65,100, a sum which the court found to be the value of the cars at the time and place of conversion. That judgment is still unsatisfied.

The pre-trial order in this case specifies as one of the issues to be tried whether All Commerce was indebted to plaintiff at the time of the unauthorized release of the 42 cars. This is no doubt on the theory that if All Commerce was not so indebted, then the lien on the cars afforded to plaintiff by the letter of credit agreement would have been extinguished. There is no doubt whatever on the evidence that All Commerce was indebted to plaintiff. I find that the indebtedness of All Commerce to plaintiff on August 16, 1960 was $100,995.22 on transaction 1170 and $236,718.13 on transaction 1173. On August 20, 1960, the indebtedness was $101,198.98 and $253,797.03 respectively. Although the indebtedness was subsequently reduced by payments for other cars and by other credits to the account arising from transactions not material here, the net total indebtedness on transactions 1170 and 1173 has never been less

than $75,313.24 since August 16, 1960. Since All Commerce's net indebtedness on transactions 1170 and 1173 has always been more than the amount of plaintiff's claim, it is unnecessary to consider whether plaintiff may also take into account All Commerce's indebtedness arising out of other transactions.

The sole question for decision is whether by entrusting the German "title books," invoices and bills of lading to All Commerce under the trust receipts, plaintiff forfeited its lien on the automobiles. Defendant contends that it did. Defendant argues that the legal effect of the trust receipts was to empower All Commerce to sell the cars and pass title thereto. Therefore, defendant says, its release of the 42 cars to All Commerce and its subsequent delivery of them to All Commerce's customers upon All Commerce's instructions was a delivery to a person who had complete title to them. Consequently, defendant claims that although it concededly broke its contract of storage with plaintiff, it did not convert the automobiles and can hence be held liable at most for nominal damages.

In considering this contention it may be noted at the outset that it is inconceivable that plaintiff could have intended the trust receipts to have that effect. To give them that effect would completely frustrate the elaborate mechanism of the loan agreement, letter of credit agreements, and storage of the cars under plaintiff's control, which plaintiff had set up with the obvious purpose of preserving its lien until the debt was paid.

Concededly defendant had never seen the trust receipts and did not know of their existence. It is obvious, therefore, that it never relied on their terms.

Under these circumstances, must it be held that plaintiff, by the use of somewhat inept language in the trust receipts, language of which defendant was never aware, unwittingly destroyed all the precautions which it had taken for its security?

Undeniably the language of the trust agreements is imprecise. The "property"

covered by the trust receipt of August 2, 1960 is described as:

"81 title books and 81 x 3/3 Foreign Commercial Invoices covering 81 cars, as per attached Schedule "B/L#7 dated Hamburg, July 18, 1960."

The description of the property in the other two receipts is similar. The "purposes" of each trust receipt are recited to be:

"To allow Trustee to secure New Jersey titles, offer for sale and from the proceeds of these sales repay Entrustor for advances made."

I cannot accept plaintiff's contention that the receipts related only to the title documents. If so, All Commerce would have been authorized to sell the commercial invoices and bills of lading. Such a construction makes no sense. It must have been intended by the trust receipts to authorize All Commerce to sell the automobiles themselves, after having placed itself in a position to do so by obtaining New Jersey title certificates for them upon presentation of the invoices, bills of lading and German certificates of origin.

If the question here were whether the ultimate bona fide purchasers of the cars from All Commerce obtained complete and unrestricted title to them, it might well be that the answer, under the Uniform Trust Receipts Act, would be that they did. New York Personal Property Law, McKinney's Consol.Laws, c. 41, §: 58–a.

But that is not the question here. The point to be decided is whether, in view of the provisions of the trust receipts, defendant could release the cars to All Commerce, in admitted violation of its contract with plaintiff, without incurring liability for conversion.

The critical fact, in my opinion, is that as between plaintiff and All Commerce, the trust receipts by their terms preserved plaintiff's lien on the automobiles. The documents were entrusted to All Commerce as Trustee "to be dealt with by

the Trustee as agent of, and for the use of, the Entrustor * * *." The receipts provide:

"The delivery herein is temporarily made to the Trustee for convenience only without novation and without giving the Trustee any title to the documents or goods and merchandise they represent, except as Trustee and Agent for the Entrustor for the purposes herein indicated."

They further provide:

"It is agreed that a security interest (as defined in the Uniform Trust Receipts Law of the State of New York) in the goods, documents and/or instruments mentioned herein remains in the Entrustor."

As between plaintiff and All Commerce, therefore, All Commerce did not obtain complete title to the cars. The uncontroverted proof of the practice consistently followed by the parties shows that All Commerce understood that before a car would be released by plaintiff, All Commerce must pay to plaintiff a specific sum in reduction of its indebtedness. All Commerce had no right, as against plaintiff, to obtain the release of the cars and dispose of them without plaintiff's knowledge or consent and without making any payment to plaintiff. In so doing, All Commerce converted the cars. The Superior Court of New Jersey has expressly so held. Can defendant, in releasing the cars to All Commerce, stand in any better position than All Commerce? I think not. Defendant was not a bona fide purchaser. I hold that in disposing of the cars, in violation of its contract with plaintiff, pursuant to the instructions of a converter, defendant also converted them. See Restatement, Torts (1934) § 232.

As far as the measure of damages is concerned, it is entirely clear that the law of Maryland, which is the applicable law (Restatement, Conflict of Laws (1934) § 412), follows the usual rule that damages are to be measured by the market value of the property at the time and place of conversion. Saunders v. Mullinix, 195 Md. 235, 72 A.2d 720 (1950).

The New Jersey court followed this rule in awarding damages to plaintiff against All Commerce. The wholesale market value of the cars in Baltimore in August, September and October 1960 has been stipulated to be $1,550 per car, or a total of $65,100. It is immaterial that plaintiff, in administering its running account with All Commerce, would have been willing in August 1960 to have released the cars upon receiving a payment of $1,200 per car.

It is equally clear that under the Maryland law, plaintiff is entitled to interest at the rate of six per cent from the date of the conversion. Saunders v. Mullinix, supra.

Plaintiff also urges that the judgment of the New Jersey court is binding upon defendant as res judicata, even though defendant was not a party to that action. This is on the theory that defendant was in privity with All Commerce. I denied a motion for summary judgment on that ground which plaintiff made shortly before the trial of this action. I held that on the facts presented on that motion, no such privity existed. In view of the conclusion that I have reached on the merits, it is unnecessary to consider whether the facts developed at the trial would lead to a different result on that question.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Defendant's motion to dismiss the complaint is denied. The Clerk is directed to enter judgment for the plaintiff for $65,100, plus interest from the date of conversion of the cars to the date of this opinion. Since the different cars were converted at different dates, the computation of interest is somewhat complicated. Plaintiff is directed to prepare such a computation and to submit it to defendant. If the parties cannot agree on the correctness of the computation, I will determine it upon application of either party before the judgment is entered. So ordered.